# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

**ANGELA BOATWRIGHT KNOX, individually and and as Survivor and Next of Kin to JAMES EDWARD MOSS, JR., Deceased, and as Next Friend of Z.R. and R.S., Minors,**

       **Plaintiffs,**

**v.**

**CORECIVIC, INC., CORECIVIC OF TENNESSEE, LLC, d/b/a HARDEMAN COUNTY CORRECTIONAL FACILITY, and VINCE VANTELL, THEODORE WILLIAMS, SHAMEKA BIVENS, and DAMON HININGER, Individually,**

       **Defendants.**

**Case No. _____**

**Jury Demanded**

## COMPLAINT

NOW COMES Angela Boatwright Knox, individually and as survivor and next of kin to James Edward Moss, Jr., deceased, and next of kin to Z.R. and R.S., minors (hereinafter collectively referred hereto as "Plaintiffs"), and files this Complaint and would respectfully show unto the Court as follows:

### INTRODUCTORY STATEMENT

Defendant CoreCivic, Inc. is a private prison corporation with a well-known history of putting profits ahead of the health and safety of inmates. The Plaintiffs bring this action to recover damages for the wrongful death of decedent James Edward Moss, Jr. who died from an overdose of Fentanyl and Methamphetamine while housed in the Defendants' facility located in Hardeman County, Tennessee. Decedent as an inmate was under the direct custody and control of Defendants

and would not have been in a position to ingest drugs in the first instance. As a penal institution, the Defendants had a duty to prevent drugs from being brought into the facility as well as a duty to protect James Edward Moss, Jr. from the unreasonable risk of harm of a drug overdose while incarcerated. However, due to Defendants widespread and known business practices of placing profits ahead of the safety, health and wellbeing of the inmates, James Edward Moss, Jr. died in Defendants' facility. Plaintiffs seek damages for the untimely death of James Edward Moss, Jr. due to Defendants' utter disregard for his safety, health and wellbeing.

## JURISDICTION

1.    This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs assert federal claims under 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2.    Venue is proper in this Court because the acts giving rise to this lawsuit occurred in the Western District of Tennessee.

## PARTIES

3.    Angela Boatwright Knox ("Ms. Knox") is the mother of James Edward Moss, Jr., deceased, at the time of his untimely death. James Edward Moss, Jr. was a 37-year-old inmate who died at Hardeman County Correctional Facility ("HCCF"), purportedly from a drug overdose. HCCF is owned and operated by CoreCivic, Inc. and CoreCivic of Tennesse, LLC. Ms. Knox appears as next friend of Z.R. and R.S., the decedent's fourteen-year-old son and five-year-old daughter. Ms. Knox asserts claims on behalf of herself individually, Z.R. and R.S. individually and in Z.R. and R.S.'s role as survivor and next of kin to James Edward Moss, Jr.

4.    CoreCivic, Inc. is a private prison company that is headquartered in Nashville, Tennessee and is a private, for-profit prison corporation. CoreCivic, Inc. owns and operates

Hardeman County Correctional Facility, the private prison that enabled James Edward Moss, Jr.'s preventable death through customs and policies of understaffing, and profit-motivated deliberate indifference to inmate safety. CoreCivic, Inc. is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee. CoreCivic, Inc. may be served with process through its registered agent Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD., KNOXVILLE, TN 37919-5546.

5.     CoreCivic of Tennessee, LLC is a wholly-owned subsidiary of CoreCivic, Inc., and it operates all of the CoreCivic facilities in Tennessee. CoreCivic, Inc. and CoreCivic of Tennessee, LLC are hereinafter referred to jointly as "CoreCivic" or "Defendant CoreCivic."  CoreCivic of Tennessee, LLC may be served with process through its Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD., KNOXVILLE, TN 37919-5546.

6.     Vince Vantell ("Warden Vantell") was the Warden of HCCF at all times relevant. Warden Vandell may be served with process at Trousdale Turner Correctional Facility located at 140 Macon Way, Hartville, TN 37074 or any other place that he can be found.

7.     Theodore Williams ("Williams") was the shift supervisor on the day that James Edward Moss, Jr. died and who upon belief, knew about the rampant drug use and drug smuggling into HCCF. Williams may be served with process at HCCF facility 2520 Union Springs Road, Whiteville, TN 38075.

8.     Shameka Biven, ("AW Bivens") at HCCF at the time of James Edward Moss, Jr.'s death was the Assistant Warden of HCCF at all times relevant. Warden Vandell may be served with process at HCCF Facility 2520 Union Springs Road, Whiteville, TN or any other place that she can be found.

9.     Damon Hininger, President and Chief Executive Office of CoreCivic Inc., at the time

of James Edwad Moss, Jr.'s death may be served at the principal office of CoreCivic, Inc. at 5501 Virginia Way, Suite 110, Brentwood, TN 37027 or any address that he may be found.

**FACTS**

10**.** The decedent, James Edward Moss Jr. was incarcerated after being convicted of aggravated assault on July 23, 2020.

11. On that same day, July 23, 2020, decedent James Edward Moss, Jr. was sentenced to a term of three (3) years confinement with the Tennessee Department of Corrections.

12. Thereafter, sometime in April 2021, the Tennessee Department of Corrections transferred decedent James Edward Moss, Jr. to HCCF to work out the remaining term of his confinement.

13. While incarcerated at HCCF, upon information and belief, the decedent James Edward Moss, Jr. received drugs from prison guards who smuggled the drugs into the facility. Also, upon information and belief, prison guards and other prison officials turned a blind eye when individuals visiting the facility came in and provided illicit drugs to inmates. This practice of smuggling drugs into the facility was widely known to the management personnel running the prison facility, including Defendant Warden Vantell and other management officials working for CoreCivic.

14. On October 20, 2022, AW Bivens, according to the incident report, was notified around 0921 that decedent James Edward Moss, Jr. was unresponsive in his cell. *See*, Incident Report attached hereto as **Exhibit A**. Upon information and belief, prior to ingesting the methamphetamine and fentanyl, decedent James Edward Moss, Jr. was provided the illicit drugs by guards who had smuggled the drugs into the prison or guards who turned a blind eye during visitation and allowed visitors to provide inmates with illicit drugs.

4

15.     Indeed, Williams, the shift supervisor and other prison officials, including Warden Vantell, and AW Bivens, were aware that decedent James Edward Moss, Jr. was unresponsive due to a drug overdose because they required medical personnel within HCCF to administer six (6) doses of Narcan while waiting for EMS to arrive from Hardeman County. The shift supervisor, Williams, Warden Vantell and the AW Bivens obviously knew that James Edward Moss, Jr. was using drugs while in prison and that is the reason why the Narcan was administered to James Edward Moss, Jr.

16.     Narcan is a drug used to treat those suspected of a narcotic overdose during emergency situations.

17.     After EMS arrived at HCCF, they transported decedent James Edward Moss, Jr. to Boliver General Hospital, where he was pronounced dead at 0920 hrs.

18.     The decedent James Edward Moss, Jr. was thereafter transported to The West Tennessee Regional Forensic Center for further evaluation via an autopsy.

19.     On October 21, 2022, the autopsy was conducted by West Tennessee Regional Forensic Center in Memphis, Shelby County, Tennessee.

20.      The autopsy report showed that decedent James Edward Moss, Jr. had a puncture wound on his right arm in the depression of the anterior surface near the elbow.  *See*, Autopsy Report attached hereto as **Exhibit B**.

21.     Also, at the time of his death, decedent James Edward Moss, Jr. was positive for acute pneumonia and his mother, Plaintiff Angela Boatwright Knox, had no idea that he suffered from pneumonia while in the care, custody and control of Defendants.

22.     Upon information and belief, prior to his untimely death, decedent James Edward Moss, Jr. had not been cared for and treated for pneumonia.

5

23.     The autopsy report for decedent James Edward Moss, Jr. was also positive for cocaine, methamphetamine and fentanyl, and the cause of death was listed as fentanyl and methamphetamine intoxication.  However, the incident stated that James Edward Moss, Jr. incident was allegedly an "accident" according to the autopsy report.  Although, there was the existence of a "puncture wound" on decedent James Edward Moss, Jr.'s right arm, according to the incident report, Warden Vantell did not request an investigation into the death of decedent James Edward Moss, Jr.  Due to prior actions at HCCF, Plaintiffs assert that no investigation was conducted into the death of James Edward Moss, Jr. because, Defendant Warden Vantell who had final decision-making authority did not want an investigation to reveal drug smuggling into the facility which would also expose severe staff shortages, as well as, officers and guards who were unqualified to work at the facility in the first instance.

24.     Moreover, the decedent James Edward Moss, Jr. could not have overdosed but for the fact that illegal drugs were so widely available at HCCF. For the reasons set forth herein, Plaintiffs allege and assert that Defendants were deliberately indifferent to the problem of illegal drugs at HCCF.

25.     It is widely known that Defendant CoreCivic does not adequately screen the applicants that it hires as guards. Upon information and belief, the guards that were on duty on the morning of October 20, 2022, were not properly screened and were otherwise unqualified. Furthermore, upon information and belief, the guard staff are predominantly females at HCCF and other CoreCivic facilities who have gang affiliations or romantic relationships with gang members. Upon information and belief, the guards at HCCF have tattoos reflecting their gang affiliations, sometimes they talk about their gang affiliations in the presence of inmates, and sometimes they flash hand sings reflecting gang affiliations. Predictably, illegal gangs utilize the gang-affiliated

guards and prison staff to smuggle drugs into CoreCivic facilities as what occurred at the HCCF.

26.     Also, it is widely known that CoreCivic does not adequately screen guard staff for contraband. As a result, guards are able to bring illegal drugs into its correctional facilities and then unlawfully provide those to inmates. It is believed that the drugs that caused the death of James Edward Moss, Jr. were brought into the prison when drug sniffing dogs were not posted at the guard entrance into the facility.  Alternatively, when drug sniffing dogs are placed at entranced into the facility for guards, HCCF staff do not properly investigate when the dog barks to sound the alarm for drugs and the drugs are at that point smuggled into the facility to be provided to inmates.

27.     It is further widely known that CoreCivic fails to comply with generally-accepted correctional standards for preventing the entry of contraband into its facilities, further exacerbating the presence of illegal drugs into its facilities. Indeed, it is believed that the facility failed to post drug sniffing guards at the entrance of the facility at or around the time that James Edward Moss, Jr. died of the drug overdose. Alternatively, if drug sniffing dogs were posted at the entrance, at or around the time James Edward Moss, Jr. died,  HCCF staff did not properly investigate when the dog barked sounding the alarm for drugs and the drugs were at that point smuggled into the facility to the facility and provided to James Edward Moss, Jr.

28.     Plaintiffs, upon information and belief, understand that the methamphetamine and fentanyl that killed decedent James Edwards Moss, Jr. was smuggled into HCCF by guard staff, or allowed to be smuggled into the facility by guard staff, and that they are liable for his death. Due to the drug smuggling into HCCF, drugs use was prevalent at HCCF.   Warden Vantell was aware of the drug smuggling problems at the facility well in advance of James Edwaard Moss, Jr.'s death but failed to take action to prevent deaths in the facility.  Tennessee Department of

Corrections ("TDOC") Annual report shows that there were 6 deaths by accident at HCCF and 6 deaths, manner-pending. Upon information and belief, like James Edward, Moss Jr's death, some of the other deaths were caused by overdosing in the prison and listed as an accident on the prison incident report. The TDOC report was published in June 2022, four months before James Edward Moss, Jr. died. Nevertheless, Warden Vantell listed James Edward Moss, Jr. death as an accident when he knew, because of the 6 doses of Narcan that was provided to James Edward Moss, Jr. prior to his death that James Edward Moss, Jr. was under distress due to a drug overdose. As a result, Warden Vantell was deliberately indifferent to widespread drug smuggling, inadequate medical care for drug addiction, and inadequate staff at HCCF to prevent this from happening in the first instance. At the time of James Edward Moss's death, HCCF, like most other facilities operated by the Defendants were severely understaffed, and instead of investigating the death of James Edward Moss, Jr., the Defendants intentionally failed to investigate the death in an attempt to cover up the staffing shortages, drug smuggling and failures to provide adequate safety to James Edward Moss, Jr. that was so pervasive at HCCF.

29.     Although the autopsy report from the West Tennessee Medical Examiner's Office does not list the cause of death as pneumonia, Plaintiffs upon information and belief believe that personnel at HCCF failed to properly treat decedent James Edward Moss, Jr. for the acute pneumonia that he suffered. Plaintiffs make this allegation as another basis of deliberate indifference that existed at the HCCF facility. Plaintiffs assert that had HCCF properly cared for the safety and health of its inmates, decedent James Edward Moss, Jr. would not have overdosed in its facility.

30.     Defendants have a history of deliberate indifference toward the inmates in CoreCivic's facilities. In particular, CoreCivic's facilities are not equipped to provide safety and care

8

that is required for inmates. Plaintiffs would show by way of example, and not limitation, that in *Robert Owen Smith v. Elaina Rodela, et al.*, (M.D. Tenn., July 27, 2022, No. 1:22-CV-00023) 2022 WL 2975297, the plaintiff was denied treatment for his skin cancer – after it was already diagnosed – until the cancer had spread and required major surgery. Likewise, in *Stephen R. Mayes v. Dr. Elaine Rodella, et. al.*, (M.D. Tenn., January 8, 2021, No. 1:20-cv-00057), Defendants failed to refer an inmate with a life-threatening heart condition to a facility capable of treating him. And in *James Lambert v. CoreCivic, Inc., et al.*, Case No. 1:21-CV-00053 (M.D. Tenn.), the Defendants failed to seek outside care for an inmate suffering from serious liver diseases. In this case, it is apparent the Defendants knew that James Edward Moss, Jr. had a drug problem when it gave him 6 doses of Norcan but failed to protect and care for him from the unreasonable risk of harm of a drug overdose.

31.     Based on the fact that Defendants were immediately providing decedent James Edward Moss, Jr. with Narcan, it is obvious that the staff or guard(s) knew that he suffered from a drug addiction that was obviously not properly cared for while at HCCF. HCCF had a duty to provide drug related relief to cure any drug related issues that decedent James Edward Moss, Jr. suffered from, but Defendants miserably failed in that regard.

32.     In order to save costs and increase profits, Defendant CoreCivic, its wardens, its senior officers, and its directors have developed a policy of denying proper care to inmates. Given the numerous cases filed against the Defendants alleging drug smuggling, improper care and treatment of inmates as well as inmates dying from drug overdoses, the board of directors is aware of the practice and has ratified it.

33.     The incident involving decedent James Edward Moss, Jr. is part of a pattern. In the years preceding the events set forth above, Defendant CoreCivic paid millions in settlements

9

around the United States because (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical care, drug related care and other mental health care to inmates.

34.    In 2016, CoreCivic and its directors were sued by company shareholders because, among other things, the company misrepresented its pattern of understaffing and poor medical care, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with CoreCivic. Notwithstanding these and numerous other warnings, CoreCivic continued to provide inadequate staffing, supervision, and medical care at its facilities, including HCCF.

35.    Under the leadership of Damon Heninger, the chief executive officer of CoreCiviv, CoreCivic has an established history of putting profits ahead of the health and safety of inmates. According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, inmates referred to CoreCivic's Idaho Correctional Center as "Gladiator School" because the understaffing led to such a violent atmosphere at the prison. CoreCivic settled the lawsuit with the ACLU, agreeing to provide minimum staff levels, but the company was held in contempt of court in 2013 because it violated the agreement and falsified records to misrepresent the number of guards on duty. In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees." Idaho Governor, Butch Otter, ordered state officials to take control of the prison, and the company paid the state $1 million for understaffing the prison.

36.    On or about February 23, 2017, a federal jury found that CoreCivic violated inmates' Eighth Amendment rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correctional Center.  The jury did not award damages, however, because it found that the inmates' particular injuries were caused by other factors.

37.     In Oklahoma, ten (10) prisoners in a prison operated by CoreCivic, were involved in a fight on February 25, 2015, that left five (5) of the prisoners with stab wounds. The following month, eight (8) more were involved in another stabbing incident. In June of that same year, thirty-three (33) gang members fought with weapons and eleven (11) prisoners were sent to a hospital. On September 12, 2015, four (4) inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively allowed to run the prison. According to an investigation by the Oklahoma Department of Corrections, video evidence of the September 12, 2015, incident from three (3) different cameras at the facility was recorded over or deleted by CoreCivic employees. Two (2) guards were later indicted for bringing drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicides in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's prison population.

38.     In August of 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the Federal Bureau of Prisons by private contractors, including those operated by CoreCivic. As a result, the Department of Justice indicated that it would phase out its relationships with private prisons. That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found widespread understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshals Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015. Earlier, the company tried to hide the fact that it was packing three (3) inmates into two-inmate cells at Leavenworth, contrary to prison regulations. The following excerpt appears in the April 25, 2017, OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its

practice of triple bunking detainees. LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 American Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

39.     In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately twenty (20) inmates and prison staff. OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members. A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems. The report specifically cited the lack of Spanish- speaking staff and staff inexperience.
>
> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

40.     A state audit released in 2017 found that WCF needed seventy-nine (79) officers to cover seventeen (17) positions during a shift, but on average the facility provided only fifty-seven (57) officers per shift. The same audit found systemic problems at HCCF, including understaffing and gang violence. The audit further noted that information provided by CoreCivic concerning HCCF and another facility was so incomplete that it was not possible to determine the accuracy of staffing levels. The Plaintiffs allege in addition to covering up the unconstitutional violations in this case, that CoreCivic deliberately provides incomplete information in order to disguise the fact that it was understaffing its facilities.

41.     On December 12, 2017, a former guard at Trousdale-Turner Correctional Facility (operated by CoreCivic) testified before a legislative committee that she resigned from the company in September after witnessing two (2) inmates die from medical neglect during the seven (7) months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three (3) days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials. In this case, it was apparent to someone that James Edward Moss, Jr. needed Narcan when he was found unresponsive, and that HCCF more likely than not failed to provide him with the necessary treatment to stop his illicit drug use.

42.     The Plaintiffs allege that the foregoing incidents actually understate the problem. A scathing audit released by the Tennessee Comptroller on January 10, 2020, found that CoreCivic had not properly recorded information about accidents, illnesses, and traumatic injuries at three (3) of its facilities in Tennessee, including HCCF and WCF. The same audit found that WCF was missing nearly one-third of its medical and mental health personnel during two (2) different audit periods and that homicides were two times more likely in CoreCivic facilities than in state-operated facilities.

43.     The Plaintiff has attached hereto as **<u>Exhibit C</u>** a copy of the original complaint from *G. Marie Newby vs. CoreCivc of Tennessee, LLC, et al*., which is pending before the Middle District, Case No. 3:22-cv- 00093. The Plaintiffs incorporate that complaint as well as its exhibits (Dkt. #s 1-1 through 1-8) by reference as if fully set forth herein. Paragraphs 1-10 of the *Newby* complaint show that Defendant CoreCivic systematically disregarded inmate safety for the purpose of increasing profits. Paragraphs 32, 58, 69-71, 75-76, 84, and 86-87 set forth how Damon Hininger was fully aware of Defendant CoreCivic's practice of putting profits ahead of inmate safety. Damon Hininger was further aware of Defendant CoreCivic's policy of deliberate difference

toward inmates' medical needs based on widespread media reports of inadequate medical care at the company's facilities. *See, e.g.,* "Mexican man's widow sues over Otay Mesa jail death, says pleas for help ignored," March 23, 2017 *The San Diego Union-Tribune*, https://www.sandiegouniontribune.com/news/courts/sd-me-detention-lawsuit-20170323-story.html; "Lawsuit: CoreCivic Staff Ignored Scabies Infection For A Full Year," July 31, 2017 *NewsChannel5 Nashville*, https://www.newschannel5.com/news/lawsuit-corecivic-staff-ignored-scabies-infection-for-a-full-year; "Man's death hints at wretched medical care in private immigration prisons," November 1, 2016 *The Guardian*, https://www.theguardian.com/us-news/2016/nov/01/jose-jaramillo-private-immigration-prisons-medical-care; A March 10, 2017, report specifically noted that immigrant detainees were placed in the isolation unit (not unlike SCCC's disciplinary segregation) rather than the medical unit, and one of those detainees, like Addison, had a mental health condition. *See* "ICE detainees are asking to be put in solitary confinement for their own safety," March 10, 2017 *The Verge*, https://www.theverge.com/2017/3/10/14873244/ice-immigrant-detention-solitary-trump-corecivic-geo. And as of 2018, CoreCivic was facing multiple lawsuits due to inadequate medical care at TTCC. *See* "At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'," August 7, 2018 *The Tennessean*, https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/.

44.     The foregoing incidents – and others like them – demonstrate that Defendant CoreCivic, its wardens, its senior officers, and its directors adopted and enforced a corporate policy of deliberate indifference to inmate health and safety. Specifically, Defendants, its wardens, its senior officers, and its directors were aware of widespread drug smuggling, inadequate guard staffing, and inadequate medical care throughout CoreCivic's facilities in Tennessee to include

HCCF, but they have been deliberately indifferent to these problems, making them directly responsible for the death of James Edward Moss, Jr. at HCCF.

45.     The directors and senior officers of CoreCivic knew that inadequate supervision, inadequate medical care, inadequate training, and improper inmate segregation practices were rampant at the company's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety, such as the drug overdose that caused the death of James Edward Moss, Jr. at HCCF.

46.     CoreCivic has—and it has long had—actual knowledge that HCCF is severely understaffed. Indeed, HCCF and other entities owned by Defendants are understaffed *deliberately*, because paying for sufficient staffing is expensive and understaffing is more profitable.

47.     Generally speaking, the less money that CoreCivic spends on staff and inmate health and safety, such as treating drug addiction and preventing drug overdosing at HCCF, the higher CoreCivic's profit margin. In all instances, CoreCivic acts to maximize profit for the benefit of its shareholders.

48.     Also, CoreCivic failed to hire qualified personnel as guards at HCCF because to do so would require it to pay out more in salaries, which would negatively affect its bottom line. Upon information at belief, at the time that James Edward Moss, Jr. died, several guards working there at the time were unqualified. Since profits at all costs are the motivating factor, the current guards on duty at facilities such as HCCF are not properly vetted, not properly trained and for these reasons, drugs are easily smuggled into the facilities. But for this unlawful conduct on behalf of Defendants, decedent James Edward Moss, Jr. would not have died in its facility.

49.     Given its focus on maximizing profit, CoreCivic routinely fails to meet constitutionally adequate safety standards at HCCF, resulting in recurring, preventable, and

disproportionately high instances of preventable inmate-on-inmate assaults, as in this case, Plaintiffs allege that had Warden Vantell took reasonable actions to stop the widespread pattern of allowing drugs to permeate the facility at HCCF, the puncture wound may have been caused by inmate misconduct and more likely was more than not han likely caused the overdose resulting in James Edward Moss, Jr.'s untimely death.

50.     Inmates at the Defendants' facilities, including decedent James Edward Moss, Jr., have died and continue to die needlessly as a result of the premeditated and profit-motivated understaffing choices.

51.     Damon Hininger—CoreCivic's Chief Executive Officer—has actual knowledge of chronic understaffing.  Even so, he has willfully failed to remedy it and this pattern of conduct show his deliberate indifference to inmate safety, both because understaffing is more profitable and because he does not care when inmates in CoreCivic's care needlessly die.

52.     Jason Medlin, CoreCivic's Vice President of Operations Administration, also has actual knowledge of endemic understaffing at CoreCivic facilities such as HCCF.  Even so, he has similarly failed to remedy the problem that exists at HCCF.

53.     HCCF's understaffing coupled with the illicit and unlawful drug smuggling into the facility, heightened risk of an overdose by fentanyl and methamphetamines, because understaffing is profitable and because Jason Medlin, too, is unbothered when inmates in CoreCivic's care needlessly die.

54.     Warden Vantell, who at the time of decedent James Edward Moss, Jr.'s untimely and preventable death was the warden of HCCF, was similarly aware of HCCF's understaffing problems as well as the illicit and unlawful drug smuggling being done by untrained and ill prepared prison guards.  Indeed, he observed them personally almost every single day that he

served as Warden. Even so, Warden Vantell consciously neglected to remedy HCCF's chronic understaffing and drug smuggling into the facility despite his personal knowledge of the drug smuggling and the potential overdose caused by illicit drug use in prisons owned by Defendants. Indeed, on the day that James Edward Moss, Jr. died, Warden Vantell as well knew about the understaffing issues that persisted and that was the moving force behind his decision to not investigate James Edward Moss, Jr.'s death.

55.     Owing to the fact that the Defendants' tortious misconduct caused the death of James Edward Moss, Jr., since he died, he was unable to exhaust administrative remedies regarding the causes of action at issue in this Complaint in advance of its filing.

## CAUSES OF ACTION

### CLAIM #1: 42 U.S.C. § 1983—DELIBERATE INDIFFERENCE TO AND FAILURE TO PREVENT FORESEEABLE OVERDOSE OF JAMES EDWARD MOSS, JR. (AS TO ALL DEFENDANTS)

56.   The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

57.   At all times relevant to this Complaint, all Defendants had legal duties under the Eighth Amendment to protect James Edward Moss, Jr. from overdosing while under the care, custody and control of HCCF.

58.   In this case, due to the widespread pattern of drug smuggling into the facility, James Edward Moss, Jr was at a substantial risk of harm from overdosing well in advance of his death by overdosing before the incident occurred on November 20, 2023.

59.   Warden Vantell knew of the of the substantial risk of harm from overdosing to James Edward Moss, Jr. but failed to take reasonable actions to prevent his death. Indeed, Defendants are and may be held liable for acting with deliberate indifference to decedent James Edward Moss, Jr. safety at HCCF when they failed to prevent unlawful drugs from being

smuggled into the facility by guards on the days leading up the death of decedent James Edward Moss, Jr.

60.  Defendants, its senior officers, and its directors failed to protect decedent James Edward Moss, Jr. from a known risk of harm, overdosing through illicit drug use in the facility that led to his untimely death.

61.  When James Edwad Moss, Died, all Defendants failed to ensure decedent James Edward Moss, Jr. reasonable safety at HCCF.

62.  All Defendants acted with deliberate indifference to decedent James Edward Moss, Jr.'s safety while he was an inmate at HCCF.

63.  Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors knew that decedent James Edward Moss, Jr. faced a substantial risk of serious harm at HCCF as a result of its chronic understaffing and the hiring of unqualified staff to work as guards at or around the time of his death.  Similarly, Defendants knew that drug smuggling was a common problem at the facility and coupled with the understaffing problems combined with unqualified guards, heightened the use illicit drugs in the facility making it foreseeable that a prisoner such as James Edward Moss, Jr. who was provided illicit drugs caused his overdose.

64.  Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors disregarded known risks to decedent James Edward Moss, Jr. at HCCF by failing to take reasonable measures to abate them.

65.  Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors were actually aware of the specific and particularized risks of serious harm posed to inmates like decedent James Edward Moss, Jr. as a consequence of, *inter alia*, CoreCivic's deliberate understaffing of HCCF, CoreCivic's failure to properly train and supervise the staff

at HCCF, to ensure adequate staffing levels; HCCF's failure to adhere to safety protocols; and HCCF's failure to prevent illicit drug use and house inmates in its care correctly and in accordance with generally accepted practices in prison management.

66.    At the time of James Edward Moss, Jr.'s death, HCCF, like most of the Defendants' facilities, was plagued by constant illicit drug use and other pervasive risks of physical harm to inmates.

67.    At the time James Edward Moss, Jr. died from fentanyl and methamphetamine overdose, HCCF's pervasive risk of harm to inmates manifested in actual harm to decedent James Edward Moss, Jr. when he was found unresponsive in his cell and prison officials thereafter immediately provided him with Narcan, a known drug used to treat overdoses, because they all knew that drug smuggling was a commonplace and that they failed in their duty to stop drug smuggling in the prison.  At the time James Edward Moss, Jr. died, Warden Vantell knew that the facility was plagued by longstanding, pervasive, well-known, drug smuggling and drug use that routinely went unreported to state regulators. Indeed, in an effort to cover up the unconstitutional conduct, Warden Vantell as well as others with final making authority in such matters covered up the conduct when it refused to investigate the death of James Edward Moss, Jr.

68.    At the time James Edward Moss, Jr. died, Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors had been exposed to information concerning the risk of drug smuggling at HCCF, including audits by regulators, and they must have known about it.

69.    At the time James Edward Moss, Jr. died, Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors had actual or constructive knowledge of

the constant and pervasive risk of harm to inmates generally and to decedent James Edward Moss, Jr. specifically while he was a prisoner at HCCF. At bottom Warden Vantell, knew about the issues of drug smuggling plaguing the facility at the time decedent James Edward Moss, Jr. died and failed in his duty to take reasonable steps to stop it.

70.   Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors were additionally aware of the specific and particularized risk of serious harm posed to James Edward Moss, Jr. as a consequence of the fact that—rather than maintaining inmate safety—CoreCivic's officers facilitate drug smuggling within HCCF to enable the drug trade, drug use, and the spread of contraband within the facility.

71.   To the extent that CoreCivic attempted to provide decedent James Edward Moss, Jr. with Narcan, such attempt was rendered ineffective due to understaffing, the fact that guards are untrained, and that themselves, for the most part, are responsible for the illicit drugs being in the facility.  In combination with these chronic failures, decedent James Edward Moss, Jr. died from a drug overdose.

72.   Despite Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors' actual awareness of the severe risks to inmate safety within HCCF, they consciously and deliberately failed to address those risks because deliberate indifference to inmate safety is more profitable.

73.   Because undue deaths at the Defendants facilities have not been met with meaningful remedial action, CoreCivic continues to maintain a chronically unsafe and understaffed facility, because it does not expect that regulators or the Court system will take any meaningful remedial action against it.

74. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

75. Defendant CoreCivic has adopted a policy and practice of severely understaffing its facilities and placing unqualified guards at posts in its facilities including HCCF, without regard to inmate safety because understaffing is more profitable.

76. As a result of audits identifying HCCF and other facilities owned and operated by Defendants, identifying severe understaffing issues that abound and thousands of violent incidents—both reported and unreported—at the facility over a period of years, CoreCivic had actual knowledge of HCCF's chronic understaffing problems, but it opted not to staff HCCF adequately on the date of James Edward Moss, Jr.'s death because doing so would have been less profitable.

77. At the time James Edward Moss, Jr.'s died, CoreCivic's employees, including Warden Vantell, its senior officers, and its directors, had actual knowledge that HCCF's chronic understaffing problems resulted in drug smuggling into the facility, rampant and pervasive drug use and failure on he part of CoreCivic to provide proper care to inmates such as James Edwad Moss, Jr. that who died due to unchecked drug smuggling into HCCF.

78. CoreCivic's policy and practice of understaffing is widespread, rampant, and endemic to CoreCivic's prison facilities, including HCCF.

79. Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors knew of the heightened and chronic safety risks to inmates resulting from understaffing at HCCF, but they tolerated, maintained, and promoted understaffing to generate

greater profits for CoreCivic at the expense of the safety of inmates like James Edward Moss, Jr.

80. James Edward Moss, Jr.'s death is attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, HCCF, which was explicitly or impliedly authorized by CorveCivic's wardens (Warden Vantell), its senior officers, and its directors, and in which they knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of prioritizing profit over inmate safety, to prevent drug smuggling into the facility which in turn caused the death of James Edward Moss, Jr. when he died from a drug overdose..

81. If HCCF properly staffed HCCF, prevented the illicit smuggling and use of illicit drugs in its facility as it had a duty to do, decedent James Edward Moss, Jr. would not be dead.

82. HCCF's chronic understaffing also continues to remain unremedied even after James Edward Moss, Jr.'s death and it is believed that inmates continue to die in facilities owned by Defendants with dramatically increased frequency. In many cases, such deaths are kept hidden from and unreported to the public.

83. Specifically, Defendant Warden Vantell, who had final decision-making authority into such matters, refused to investigate the death of James Edward Moss, Jr. in order to cover up the unconstitutional conduct that caused him death as wet forth herein.

CLAIM #3: TENNESSEE COMMON LAW NEGLIGENCE /GROSS NEGLIGENCE
(AS TO ALL DEFENDANTS)

84. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

85. Defendant CoreCivic, its wardens (Warden Vantell), (AW Bivens) Williams, its

senior officers, and its directors owed a legal duty of care to decedent James Edward Moss, Jr. to protect him from reasonably foreseeable harm.

86.    Because drug smuggling and drug use was widely known to occur at HCCF, Defendants CoreCivic and Warden Vantell knew of or had reason to anticipate that decedent James Edward Moss, Jr. and other inmates would receive illicit drugs in the facility from prison personnel and indeed in this cause suspected same because at the time James Edward Moss, Jr. was found unresponsive in his cell, HCCF immediately gave him six (6) doses of Narcan, a drug used to treat someone suspected of a drug overdose.

87.    Based on the foregoing, Defendant CoreCivic, its wardens (Warden Vandell), its senior officers, and its directors had actual and constructive notice of the risk of foreseeable harm that illicit drug use had on James Edward Moss, Jr. specifically, and they had reason to anticipate the problem.

88.    Accordingly, Defendant CoreCivic, its wardens (Warden Vantell), its senior officers, and its directors knew or should have known that decedent James Edward Moss, Jr. would become the victim of a possible drug overdose, but they failed to use reasonable care to prevent it.

89.    Defendants breached of their duty of care to decedent James Edward Moss, Jr. that proximately caused him to die of an overdose while under their care, custody and control of HCCH, CoreCivic and each named Defendant.

### CLAIM #4: LOSS OF CONSORTIUM
### (AS TO ALL DEFENDANTS)

90.    The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

91.   Tennessee allows for an award of damages for loss of filial consortium and other damages for the death of one's child under Tenn. Code Ann. § 20–5–113. See *Hancock v. Chattanooga-Hamilton Cty. Hosp. Auth.,* 54 S.W.3d 234, 236 (Tenn. 2001).

92.   The Defendants' wrongful acts, faults, omissions, and tortious misconduct caused Plaintiff Angela Boatwright Knox to suffer a loss of filial consortium and other damages arising from the death of her beloved son, James Edward Moss, Jr.

93.   Accordingly, Ms. Knox is entitled to an award for damages, including the pecuniary value of James Edward Moss, Jr.'s life and the loss of her son's attention, guidance, care, protection, companionship, cooperation, affection, and love.

<u>CLAIM #5: TENN. CODE ANN. § 1-3-121</u>
<u>(AS TO DEFENDANT CORECIVIC)</u>

94.   The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

95.   Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities.

96.   Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities because it is cheaper and more profitable not to do so and because it does not fear meaningful regulatory or judicial consequences if it maintains understaffed facilities.

97.   In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic fails to document, disposes of, takes measures to conceal, and falsifies records and evidence of its deliberate indifference to inmate safety. In this case, they specifically failed to

even investigate James Edward Moss, Jr.'s untimely death.

98. Tenn. Code Ann. § 1-3-121 enables Plaintiffs to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action. It specifically provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."

99. Defendant CoreCivic's chronic deliberate indifference to inmate safety contravenes the provisions of the Eighth Amendment to the United States Constitution.

100. Defendant CoreCivic's actions additionally contravene Tenn. Const. Art. I, § 32, which provides that: "That the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

101. Absent, at minimum, regular independent monitoring and unannounced inspections designed to determine whether Defendant CoreCivic has remedied its chronic and profit-motivated deliberate indifference to inmate safety and other unlawful conduct described above, CoreCivic will continue to act both illegally and unconstitutionally with respect to its operation of HCCF.

102. To remedy CoreCivic's chronically illegal and unconstitutional actions at HCCF, this Court should appoint an independent monitor at Defendants' expense to conduct regular unannounced inspections of HCCF and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct.

103. In the absence of CoreCivic coming into compliance with its obligation to ensure a constitutionally adequate level of inmate safety, this Court should issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate HCCF going forward.

25

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for the following relief:

1. That proper process be issued and served upon Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2. That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

3. That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

4. That the Plaintiffs be awarded all compensatory, consequential, and incidental damages to which they are entitled in an amount not less than $2,500,000.00;

5. That the Plaintiffs be awarded punitive damages of not less than $5,000,000.00;

6. That Defendant CoreCivic's profits arising from its chronically unconstitutional understaffing at HCCF be disgorged;

7. That the Plaintiffs be awarded all costs and discretionary costs of trying this action;

8. That the Plaintiffs be awarded their reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b) and an appropriate multiplier of said fees;

9. That a jury of twelve (12) be empaneled to try this cause;

10. That pre-judgment and post-judgment interest be awarded to the Plaintiffs;

11. That this Court declare that CoreCivic acted illegally by failing to ensure a constitutionally adequate level of inmate safety at HCCF that lead to the untimely death of James Edward Moss, Jr.;

12. That this Court appoint an independent monitor to conduct regular unannounced inspections of HCCF and report whether Defendant CoreCivic has remedied its chronic and profit-

motivated unlawful conduct, and that this Court issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate HCCF if it fails to do so; and

13. That the Plaintiffs be awarded all further relief to which they are entitled.


Respectfully submitted,


ESKINS, KING & MARNEY, P.C.


BY: /s/ James E. King, Jr.
JAMES E. KING, JR. (#21219)
200 Jefferson, Suite 1510
Memphis, TN 38103
Phone: 901-578-6902
Fax:    901-578-8690
*Attorneys for Plaintiffs*


BRADLEY W. ESKINS (#19372)
200 Jefferson, Suite 1510
Memphis, TN 38103
Phone: 901-578-6902
Fax:    901-578-8690
*Of Counsel for Plaintiffs*