| | | |
|---|---|---|
| ANGELA BOATWRIGHT KNOX, individually and as Survivor and Next of Kin to JAMES EDWARD MOSS, JR., Deceased, and as Next Friend of Z.R. and R.S., Minors, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | NO. 3:23-cv-01104 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| | ) | |
| CORECIVIC, INC., CORECIVIC OF TENNESSEE, LLC, d/b/a HARDEMAN COUNTY CORRECTIONAL FACILITY, and VINCE VANTELL, THEODORE WILLIAMS, SHAMEKA BIVENS, and DAMON HININGER, Individually, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is the motion to dismiss (Doc. No. 58, "Motion") Plaintiff Angela Boatwright Knox's[1] second amended complaint (Doc. No. 57, "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed by Defendants, CoreCivic, Inc., CoreCivic of Tennessee, LLC, Vince Vantell, Damon T. Hininger, Shameka Bivens, and Theodore Williams.

Defendants filed a memorandum in support of the Motion (Doc. No. 59), and Plaintiff filed a response in opposition to the Motion (Doc. No. 61, "Response"),[2] whereafter Defendant filed a

---

[1] Plaintiff Angela Boatwright Knox styles herself as bringing claims individually, as "survivor and next of kin to James Edward Moss, Jr., deceased" and as "next friend of Z.R and R.S., minors [and children of Moss]," (Doc. No. 57 at 1). The Court herein uses "Plaintiff" (in the singular) to refer to Knox collectively in all of her purported capacities and uses "Moss" to refer to the decedent, James Edward Moss, Jr.

[2] Although Plaintiff first filed a response in opposition to the Motion at Docket No. 60, Plaintiff then filed a "Corrected Response and Memorandum in Opposition to Defendants' Motion to Dismiss" at Docket No.

reply in further support of the Motion (Doc. No. 62). For the reasons provided herein, the Court will **GRANT** Defendants' Motion.

BACKGROUND[3]

Below, the Court begins by providing a brief overview of the parties to this action, then provides an overview of the circumstances out of which this action arose, and finally reviews Plaintiff's claims in light of Defendants' Motion.

### I.      The Parties

Plaintiff "is the mother of [] Moss . . . who died at Hardeman County Correctional Facility ('HCCF'), purportedly from a drug overdose." (Doc. No. 57 at ¶ 3). Plaintiff "appears as next friend of Z.R. and R.S., [Moss's] fourteen-year-old son and five-year-old daughter." (*Id.*). Plaintiff "asserts claims on behalf of herself individually, Z.R. and R.S. individually, and in Z.R. and R.S.'s role as survivor and next of kin to [Moss]." (*Id.*). Moss, the decedent, was thirty-seven years old at the time of his death. (*Id.*). Defendant CoreCivic, Inc. "is a private prison company that is headquartered in Nashville, Tennessee and is a private, for-profit prison corporation [operating HCCF] . . . CoreCivic, Inc. is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee." (*Id.* at ¶ 4). Defendant CoreCivic of Tennessee, LLC is "a wholly-owned subsidiary of [Defendant] CoreCivic, Inc., and it operates all

---

61. The Court has defined Plaintiff's "Response" as Docket No. 61 and will treat it as Plaintiff's response to the Motion, disregarding the original response at Docket No. 60. The Court notes that, in formatting unusual for a brief in response to a motion to dismiss, the Response includes numbered paragraphs—indeed, two different sets of numbered paragraphs. The first set comprises paragraphs numbered 1-10. (Doc. No. 61 at 3-4). The second set comprises paragraphs numbered 1-42. (*Id.* at 4-11).

[3] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

of the CoreCivic[4] facilities in Tennessee." (*Id.* at ¶ 5). As to the individual defendants, Defendant Vantell "was the Warden of HCCF at all times relevant." (*Id.* at ¶ 6). Defendant Williams "was the shift supervisor on the day that [Moss] died." (*Id.* at ¶ 7). Defendant Bivens "was the Assistant Warden of HCCF at all times relevant." (*Id.* at ¶ 8). And Defendant Hininger was the "President and Chief Executive Office of CoreCivic Inc., at the time of [Moss's] death." (*Id.* at ¶ 9).

## II.      Factual Background

The instant action arises out of Moss's death on October 20, 2022,[5] resulting from an overdose of various drugs. (Doc. No. 57 at ¶¶ 14, 17-18, 23). On October 20, 2022, "[Defendant] Bivens, according to the incident report, was notified around 0921 that [Moss] was unresponsive in his cell." (*Id.* at ¶ 14). "[W]hile waiting for EMS[6] to arrive," Defendants "Williams . . . Vantell, and [] Bivens" caused "[HCCF] medical personnel . . . to administer six (6) doses of Narcan," a drug "used to treat those suspected of a narcotic overdose during emergency situations," to Moss. (*Id.* at ¶¶ 15-16). EMS then "transported [Moss] to Boliver General Hospital, where he was pronounced dead at 0920[7] hours." (*Id.* at ¶ 17). On October 21, 2022, an autopsy was conducted on Moss by West Tennessee Regional Forensic Center in Memphis, Tennessee. (*Id.* at ¶ 19). The autopsy report for Moss "was . . . positive for cocaine, methamphetamine and fentanyl, and the

---

[4] The Court will sometimes refer to Defendant CoreCivic, Inc. and Defendant CoreCivic of Tennessee, LLC collectively as "CoreCivic" herein. The Court notes that in her Complaint, Plaintiff refers to Defendant CoreCivic, Inc. and Defendant CoreCivic of Tennessee, LLC collectively as "CoreCivic" or "Defendant CoreCivic." (*See, e.g.,* Doc. No. 57 at ¶ 13).

[5] The Court notes, but does not otherwise opine on, the contradiction resulting from Plaintiff's subsequent allegation that Moss's "death by overdosing . . . occurred on November 20, 2023." (*Id.* at ¶ 71).

[6] Plaintiff does not define what "EMS" stands for in the Complaint. The Court will assume, given the context wherein Plaintiff utilizes "EMS," that "EMS" represents an acronym for "Emergency Medical Services."

[7] Again, the Court notes a contradiction resulting from Plaintiff's allegations that, on the same day, Moss was *first* pronounced dead at "Boliver General Hospital . . . [at] 0920 hours," (*id.* at ¶ 17), and *then* found unresponsive in his HCCF cell at or before "0921," (*id.* at ¶ 14).

cause of death was listed as fentanyl and methamphetamine intoxication." (*Id.* at ¶ 23). The autopsy report also "showed that [Moss] had a puncture wound on his right arm in the depression of the anterior surface near the elbow," and that "at the time of his death, [Moss] was positive for acute pneumonia." (*Id.* at ¶¶ 20-21). Moss "had not been cared for and treated for pneumonia" prior to his death. (*Id.* at ¶ 22). The autopsy report "stated that [Moss] incident [sic] was allegedly an 'accident.'" (*Id.* at ¶ 23).

Despite the "puncture wound" on Moss's right arm noted in the autopsy report, "[Defendant] Vantell did not request an investigation into [Moss's] death . . . [because] Defendant Warden Vantell who had final decision-making authority did not want an investigation to reveal drug smuggling into the facility which would also expose severe staff shortages, as well as, officers and guards who were unqualified to work at the facility in the first instance." (*Id.* at ¶ 23). "It [was] apparent [to] Defendants [and Defendants] knew that [Moss] had a drug problem when staff gave him six (6) doses of Norcan [sic]." (*Id.* at ¶ 40). Defendants failed to "properly care for [Moss]" by not "provid[ing] drug related relief to cure any drug related issues that [Moss] suffered from." (*Id.* at ¶ 41). Allegedly, Moss "could not have overdosed but for the fact that illegal drugs were so widely available at HCCF," and this prolific drug availability is, among other reasons, attributable to Defendant CoreCivic's failure to "adequately screen the applicants that it hires as guards" and failure to "properly train[]" such "otherwise unqualified" guards. (*Id.* at ¶¶ 24-25). Indeed, "the predominantly females [guard staff] at HCCF and other CoreCivic facilities . . . have gang affiliations or romantic relationships with gang members. Upon information and belief, the guards at HCCF have tattoos reflecting their gang affiliations, sometimes they talk about their gang affiliations in the presence of inmates, and sometimes they flash hand signs reflecting gang

affiliations. Predictably, illegal gangs utilize the gang-affiliated guards and prison staff to smuggle drugs into CoreCivic facilities as what occurred at the HCCF [sic]." (*Id.* at ¶ 25).

Defendant CoreCivic "does not adequately screen guard staff for contraband. As a result, guards are able to bring illegal drugs into its correctional facilities and then unlawfully provide those to inmates," and such issue is exacerbated by CoreCivic's failure to, separately or cumulatively, "not post[] [drug sniffing dogs] at the guard entrance into the facility" and/or "when drug sniffing dogs are placed at entrances into the facility for guards . . . not properly investigate when the dog barks to sound the alarm for drugs." (*Id.* at ¶ 26). In fact, Plaintiff states that "it is believed that the facility failed to post drug sniffing canines/guards at the entrance of the facility at or around the time that [Moss] died of the drug overdose. Alternatively, if drug sniffing canines were posted at the entrance, at or around the time [Moss] died, HCCF staff did not properly investigate when the dog barked sounding the alarm for drugs and the drugs were at that point smuggled into the facility and provided to [Moss] and other suspected inmates." (*Id.* at ¶ 27).

The "Tennessee Department of Corrections ('TDOC') Annual report [for 2022] shows that there were six (6) deaths by accident at HCCF and six (6) deaths, manner-pending . . . [and] like [Moss's] death, some of the other deaths were caused by overdosing in the prison and listed as an accident on the prison incident report." (*Id.* at ¶ 28). As illustrated in the following chart prepared by the Court, Plaintiff alleges that nine HCCF inmates died between January 27 and October 19, 2022, that each of those respective deaths was either attributed to drug ingestion (four deaths) or still under investigation (five deaths), and that each of those nine mortal incident involved either no use of Narcan (two incidents) or a specific number of doses of Narcan (seven instances):[8]

---

[8] It is unclear if the following nine deceased HCCF inmates were included in the "Tennessee Department of Corrections ('TDOC') Annual report [for 2022]" that Plaintiff references, in paragraph 28 of the operative Complaint, as "show[ing] six (6) deaths by accident at HCCF and six (6) deaths, manner-pending. (*Id.* at ¶ 28).

| Number | Date | Number of Narcan Doses Administered by HCCF Staff to Inmate | Asserted Reason for Death |
|---|---|---|---|
| 1 | Jan. 27, 2022 | 4 | "Death Under Investigation." |
| 2 | Mar. 9, 2022 | 8 | "Death Under Investigation." |
| 3 | Mar. 24, 2022 | 2 | "Death Under Investigation." |
| 4 | Mar. 30, 2022 | None | Meth overdose. |
| 5 | Apr. 30, 2022 | None | Meth overdose. |
| 6 | June 12, 2020 | 2 | "Death Under Investigation." |
| 7 | June 22, 2022 | 2 | "Overdose" fentanyl toxicity |
| 8 | Aug. 27, 2022 | 3 | "accidental," fentanyl toxicity |
| 9 | Oct. 19, 2022 | 8 | "Death Under Investigation." |

(*Id.* at ¶¶ 29-37).[9] "[R]ecords show that HCCH [sic] and other facilities owned by Core-Civic, use

Narcan at nearly twice the rate as [sic] TDOC facilities and they have been warned that Narcan

---

Relatedly, the Court cannot discern precisely where (or from what documents) Plaintiff derived the information set forth in the chart's column entitled "Asserted Reason for Death." As best the Court can discern, the majority come from HCCF "records" or documents. (*See id.* at ¶¶ 29-31, 34-37). Two asserted reasons for death—i.e., those asserted in paragraphs 32 and 33—lack explicit indication tying them to an HCCF "record[]" or document, saying only that "the reasons for death this particular time was, Meth overdose." (*Id.* at ¶¶ 32-33). Regardless of their provenance, the Court will construe these allegations as factual allegations regarding the *actual cause* for the inmate deaths, rather than factual allegations regarding merely what the HCCF "records" or documents *list* as the cause. This is because Plaintiff does not allege causes of death for the HCCF inmates other than via reference to the aforementioned "records" and documents.

These uncertainties are further complicated by Plaintiff's vacillation, in the Complaint and the Response, between references to a group of nine and to a group of twelve deceased HCCF inmates from 2022. (*Compare* Doc. No. 57 at ¶ 74, Doc. No. 60 at ¶¶ 29-37 and pages 18-19, 21, 23 (referencing nine inmates), *with* Doc. No. 57 at ¶ 28 and page 24, Doc. No. 60 at 3, 24-25 (referencing twelve inmates)).

Because Plaintiff alleges with specificity only nine deaths of HCCF inmates in 2022, (*see* Doc. No. 57 ¶¶ 29-37, Doc. No. 60 at ¶¶ 29-37), the Court will proceed with its analysis herein by reference to a group of nine (or ten, if also counting Moss) deceased HCCF inmates from 2022.

[9] The Court will make an observation, regarding entries number four through seven in the above chart derived from paragraphs 29 through 37 of Plaintiff's operative Complaint (Doc. No. 57), to foreshadow a point which will be relevant to the Court's subsequent analysis—namely, that (by reference to the unspecified HCCF "records" and documents discussed in footnote eight above) Plaintiff alleges that only

does not work on tranquilizers, which it has been recently discovered that Narcan does not work on tranquilizers." (*Id.* at ¶ 38). "Leading up to and at the time of [Moss's] death, HCCF was substantially short staffed. Due to the shortages of staff, drugs were easily smuggled into the facility and available for use by inmates." (*Id.* at ¶ 51). "Due to staffing shortages at HCCF, prison guards employed there were unable to conduct adequate cell searches of inmates suspected of illegal drug smuggling or drug use in the facility." (*Id.* at ¶ 52). "CoreCivic failed to hire qualified personnel as guards at HCCF because to do so would require it to pay out more in salaries, which would negatively affect its bottom line. Upon information at [sic] belief, at the time that [Moss] died, several guards working [at HCCF] at the time were unqualified. Since profits at all costs are the motivating factor, the current guards on duty at facilities such as HCCF are not properly vetted, not properly trained and for these reasons, drugs are easily smuggled into the facilities." (*Id.* at ¶ 61).

### III.   Plaintiff's Claims, Defendants' Motion

#### a.  *Plaintiff's Claims*[10]

Based on the foregoing, Plaintiff brings five claims—two based on federal law and three based on state law—against Defendants. Two of these claims are asserted solely against Defendant CoreCivic, and the other three are asserted against all Defendants.

---

four (*i.e.*, entries four through seven above) of Plaintiff's nine (excepting Moss's death) specifically alleged 2022 HCCF inmate deaths resulted from an overdose of drugs.

   Hereafter, the Court will refer to the deceased inmates reflected in entries 4 through 7 as the "Overdosing Inmates," and to all other deceased inmates reflected on the chart (*i.e.*, in entries 1, 2, 3, 8, and 9) as the "Other Inmates."

[10] The Court notes that Plaintiff, in the Complaint's caption, specifies that Defendants Vantell, Williams, Bivens, and Hininger are named as Defendants "[i]ndividually." (Doc. No. 57 at 1). From this, the Court discerns that Plaintiff intends to sue those Defendants solely in their respective individual, rather than official, capacities.

Via Count I, Plaintiff brings a claim under 42 U.S.C. § 1983 (hereinafter, sometimes, "Section 1983") against all Defendants. (Doc. No. 57 at ¶¶ 69-86). Count I is based on alleged violations of Moss's Eighth Amendment rights (as made applicable to the states via the Fourteenth Amendment) as a result of the alleged deliberate indifference[11] of Defendants to Moss and the alleged circumstances at HCCF, as well as a result of the alleged failure to prevent the (allegedly foreseeable) fatal drug overdose of Moss. Specifically, Plaintiff alleges that Defendants "acted with deliberate indifference to [Moss's] safety . . . by failing to properly hire, train, or otherwise vet correctional officers [and failing] to stop illicit drugs from entering into the facility all of which combined to contribute to [Moss's] death." (*Id.* at ¶ 75). Furthermore, Plaintiff alleges that Defendants "failed to protect [Moss] from a known risk of harm, [namely] overdosing through illicit drug use in the facility." (*Id.* at ¶ 73). Plaintiff attributes this to, variously, Defendants "fail[ing] in [their] duty to prevent the wide spread use of drugs in [their] facility," "us[ing] Narcan as [the] go to remedy for the drug use," "failing to properly hire, train, or otherwise vet correctional officers, [and] fail[ing] to stop illicit drugs from entering into the facility," and "disregarding known risks [and] failing to take reasonable measures to abate them." (*Id.* at ¶¶ 75[12]-77).

In Count II, Plaintiff brings a Section 1983 claim alleging so-called *Monell* liability (which the Court discusses below) against Defendant CoreCivic. (*Id.* at ¶¶ 87-96). Count II is based on allegations that Defendant CoreCivic adopted a "policy and practice of severely understaffing its facilities and placing unqualified guards at posts in its facilities including HCCF, without regard to inmate safety because understaffing is more profitable." (*Id.* at ¶ 88). Specifically, via Count II

---

[11] In other words, this portion of Count I is what is known colloquially as a "deliberate indifference" claim under the Eighth Amendment.

[12] Plaintiff has numbered two separate paragraphs in the Complaint as "75" and likewise has numbered two separate paragraphs as "74." (*See* Doc. No. 57 at page 21). The Court so notes primarily because the Court quotes above from each of the paragraphs numbered "75."

Plaintiff alleges that Moss's death is attributable to "CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, HCCF, which was explicitly or impliedly authorized by CorveCivic's [sic] wardens (Warden Vantell), its senior officers, and its directors to include Damon Hiniger [sic], and in which they knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of prioritizing profit over inmate safety, to prevent drug smuggling into the facility which in turn caused the death of [Moss] when he died from a drug overdose." (*Id.* at ¶ 93).

Plaintiff also asserts Tennessee state law claims[13] for "[n]egligence/[g]ross [n]egligence" (Count III) (*id.* at ¶¶ 97-102) against all Defendants, for loss of consortium (Count IV) (*id.* at ¶¶ 103-106) against all Defendants, and for violation of the Tennessee Constitution pursuant to Tenn. Code Ann. § 1-3-121 (Count V) (*id.* at ¶¶ 107-116) against Defendant CoreCivic.

  b. *Defendants' Motion*

As noted above, via the Motion, Defendants argue that Plaintiff's claims "should be dismissed in their entirety." (Doc. No. 59 at 26). Defendants assert (among other things) that: (1) with respect to Count I, Plaintiff has failed to adequately allege that any Defendant violated the Eighth Amendment with respect to Moss's death (*id.* at 4-9); (2) with respect to Count II, Plaintiff has failed to allege that Moss's death was caused by an official policy or a custom of CoreCivic (*id.* at 14-19); and (3) with respect to Plaintiff's remaining claims (i.e., the state-law claims), that Plaintiff has failed to adequately allege specific actions supporting a negligence claim as to any Defendant under Tennessee law (*id.* at 24), cannot establish standing with respect to Plaintiff's claim pursuant to Tenn. Code. Ann. § 1-3-121 (*id.*), and has failed to adequately allege facts supporting a loss of consortium claim under Tennessee law (*id.* at 25).

---

[13] As relevant here, Plaintiff asserts that the Court has jurisdiction over Plaintiff's state law claims in Counts III, IV, and V through "supplemental jurisdiction . . . pursuant to 28 U.S.C. § 1367." (*Id.* at ¶ 1).

In her Response, Plaintiff takes issue with each of Defendants' arguments, as detailed below.

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such

allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Herpst v. Parkridge Med. Ctr., Inc.*, No. E2017-00419-COA-R3-CV, 2018 WL 4052208, at *2-3 (Tenn. Ct. App. Aug. 23, 2018); *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

<u>ANALYSIS</u>

The Court next analyzes the arguments that Defendants and Plaintiff advance respectively in connection with the Motion. Specifically, the Court begins by briefly discussing the general nature of Section 1983 claims, then analyzes the parties' arguments with respect to each individual claim Plaintiff alleges, beginning with Plaintiff's federal claims (all of them Section 1983 claims, as noted above) and then turns to Plaintiff's remaining claims (i.e., the state-law claims).

## I. Section 1983 Claims Generally

Section 1983 authorizes a federal action against any person who, "under color of state law, deprives [another] person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) (citations omitted); 42 U.S.C. § 1983. Accordingly, to a claim under Section 1983, a complaint must plausibly allege (1) a deprivation of a Constitutional or other federal right, and (2) that the deprivation was caused by a "state actor." *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).

## II. Plaintiff's Federal Claims

The Court next will analyze Plaintiff's claims, beginning with Plaintiff's federal claims, i.e., Count I and Count II.

### a. *Count I: Eighth Amendment Deliberate Indifference and Failure to Protect*

Via Count I (as noted above), Plaintiff asserts a Section 1983 claim against all Defendants. (Doc. No. 57 at ¶¶ 69-86). Count I is based on alleged violations of Moss's Eighth Amendment rights as a result of the alleged "deliberate indifference" of Defendants through "fail[ing] to prevent unlawful drugs from being smuggled into [HCCF] by guards on the days leading up to the death of [Moss]," (*id.* at ¶ 72), and "failing to properly hire, train, or otherwise vet correctional officers,"

(*id.* at ¶ 75). Further, Count I is based on alleged violations of Moss's Eighth Amendment rights as a result of Defendants' alleged "failure to protect" Moss "from a known risk of harm, [namely] overdosing through illicit drug use in the facility." (*Id.* at ¶ 73, *see also, e.g.,* ¶¶ 72, 77, 81-82).

Although Plaintiff appears to couch Count I as comprising both a deliberate-indifference claim and a failure-to-protect claim (as well as nebulous allegations not clearly rendered in support of either or both of the claims), failure-to-protect claims and deliberate-indifference claims under the Eighth Amendment are governed by the same standard. *See Amick v. Ohio Dep't of Rehab. & Correction*, 521 F. App'x 354, 361 (6th Cir. 2013) (failure-to-protect claims are "governed by standards substantially similar to those applied to [] claim[s] for deliberate indifference to serious medical needs."); *Cook v. CoreCivic, Inc.*, No. 3:24-CV-00095, 2025 WL 967544, at *5 (M.D. Tenn. Mar. 31, 2025) (noting that the Sixth Circuit refers to deliberate-indifference claims alternatively as failure-to-protect claims (citing *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 683 (6th Cir. 2024))); *Starr v. Wainwright*, 686 F. Supp. 637, 647 (N.D. Ohio 2023) ("I apply the 'deliberate indifference' standard to failure-to-protect claims." (citing *Zakora v. Chrisman*, 44 F.4th 452, 468 (6th Cir. 2022))). Accordingly, the Court will apply the same standard to each of Plaintiff's purported two separate claims in Count I and will consider them concurrently below as a single claim (which the Court will refer to in terms of deliberate indifference rather than failure to protect).

To state a deliberate-indifference claim, a plaintiff must adequately allege both "an objective component (a substantial risk of harm) and a subjective component (the defendant's knowledge of and disregard for that risk)." *Cook*, 2025 WL 967544, at *4. In Plaintiff's case, the first component is that there existed an objectively serious risk to Moss's health and safety prior to Moss's overdose, and the second component is that the respective Defendants were subjectively

aware of this (objectively serious) risk but failed to take appropriate action to mitigate or eliminate it.

The Court begins by addressing the first (i.e., the objective) component. In addressing this component, the Court finds it useful to review two recent and particularly relevant Sixth Circuit opinions—*Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022) and *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679 (6th Cir. 2024).

In *Zakora*, the Sixth Circuit considered a failure-to-protect claim brought by the estate of Michael Zakora after Zakora himself overdosed in a Michigan state prison. 44 F.4th at 460-63. In *Zakora*, the Sixth Circuit reversed the district court's granting of a motion to dismiss, or in the alternative, summary judgment to defendants. The Sixth Circuit specifically concluded in part that Zakora's estate plausibly alleged an objectively serious risk of harm to Zakora himself—that is, satisfied the first component of the standard elucidated just above—based on the "unfettered access to deadly drugs inside [the prison Zakora was incarcerated at]." *Id.* at 470. The court in *Zakora* found that Zakora's estate had plausibly alleged an objectively serious risk of harm to Zakora based on three key alleged facts: (1) the "widespread presence of drugs" in the prison facility where Zakora was incarcerated, *id.* at 470, including how the drugs got into that prison facility, *id.* at 461 (noting that drugs were smuggled inside basketballs thrown over the prison fence); (2) the "two prior overdoses in Zakora's [twelve-to-sixteen-inmate housing unit in the prison] in the [two] days immediately preceding [Zakora's] death," *id.* at 471, 461; and (3) the failure of prison officials employed where Zakora was incarcerated to investigate the two previous overdose deaths in

Zakora's housing unit—overdoses that, again, occurred a mere two days before Zakora's own fatal overdose, *id.* at 461-62, 470, 472.[14]

In *Caraway*, plaintiff was the mother (and contemporaneously the estate) of an inmate who had died in CoreCivic custody due to a fentanyl overdose. The plaintiff brought Eighth Amendment deliberate-indifference claims based on the aforementioned overdose. *Caraway*, 98 F.4th at 683. Specifically, the plaintiff alleged that CoreCivic's staffing shortages led to inadequate screening of prison guards, allowing corrupt employees to smuggle in illicit drugs, which, in turn, resulted in the inmate's fatal fentanyl overdose. *Id.* at 682.

In *Caraway*, the Sixth Circuit, affirming the district court's dismissal on Rule 12(b)(6) grounds, rejected the plaintiff's Eighth Amendment deliberate-indifference claims, and held that the plaintiff did not adequately allege the commission of the asserted Eighth Amendment violation by anyone. That is, the court asked whether the plaintiff had "allege[d] facts plausibly showing [the] two components [of the failure-to-protect/deliberate-indifference standard,]" 98 F.4th at 683, and then answered the question in the negative.

First, the Sixth Circuit noted that the (objective) seriousness of the risk of harm was to be measured by the seriousness of the risk itself and not by the seriousness of what happened to the inmate (such as death by overdose) because that risk ultimately happened to be realized. *Id.* at 685. This is because "[t]he relevant constitutional 'injury' is the exposure to an objectively excessive risk, not any physical harm that befalls the inmate because of that risk." *Id.* The court then noted that "that principle of constitutional injury has implications for § 1983's causation requirement in this context." *Id.* And, turning to § 1983's causation requirement, the court explained that "the

---

[14] Later, in *Caraway*, the Sixth Circuit provided a helpful overview of the key facts on which the court relied in *Zakora* in finding an objectively serious risk of harm, as well as the applicability of these facts to similar cases in the future. *See Caraway*, 98 F.4th at 684-686.

plaintiff must show that the defendants' unconstitutional act or omission failed to alleviate the excessive risk [that the deceased inmate] faced." *Id.* Given the plaintiff's theory in *Caraway*, that meant that the plaintiff had to "allege facts supporting the conclusion that the defendants' understaffing caused drugs to proliferate at [the relevant prison]." *Id.* at 685-86.

The court held that the plaintiff failed to do so. First, the court took pains to note that the "failure to adequately staff a prison—even a deliberate one—is not itself a constitutional violation." *Id.* at 685 (citing *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012)). The court then explained that although understaffing may correlate with increased drug activity in the prison, a mere correlation does not establish a causal link between CoreCivic's staffing decisions and the specific harm that occurred. *Id.* at 686. The court emphasized that to succeed on a deliberate-indifference (i.e., failure-to-protect) claim, the plaintiff must demonstrate that CoreCivic's staffing policies directly led to the harm suffered by the inmate, and not merely that a generalized correlation exists between those policies and that harm. *Id.* As the court explained, a plaintiff must present specific, non-conclusory allegations that directly connect the alleged constitutional violation to the particular constitutional injury, rather than relying on generalized statements about the correlation between staffing levels and prison conditions. *See id.* at 685-86; *id.* at 686 ("The allegation that intentional understaffing caused drug proliferation at [the relevant prison] is thus nothing more than a 'the-defendant-unlawfully-harmed-me accusation,' which the district court properly rejected." (quoting *Iqbal*, 556 U.S. at 678)).

Crucially, the court in *Caraway* also took pains to distinguish *Zakora*. Indeed, the court noted that the Sixth Circuit's conclusion in *Zakora* (i.e., that there was an objectively serious risk of harm based on the prevalence of drugs in a prison environment) "was a limited one" based on the "egregiousness of Zakora's circumstances." *Id.* at 684. Furthermore, the court in *Caraway*

ultimately concluded that the plaintiff in *Caraway* had failed to allege an objectively serious risk (due to the proliferation of drugs) to the inmate who had died in CoreCivic custody given that "[o]nly one of the three key facts which made [*Zakora*] extraordinary" were present in the plaintiff's allegations in *Caraway*. *Id.* at 684. Specifically, the court in *Caraway* found that although the plaintiff had (arguably) alleged the widespread presence of drugs, the plaintiff's allegations "that inmates have overdosed—even at an increased rate—[did not] come close to showing the kind of excessive, one-for-every-eight risk [of an overdose that] Zakora faced," that "the [plaintiff] provides no detail about the magnitude of the overdose problem it alleges," and that there were only vague allegations about "defendants' failure to respond to the alleged drug problem[,]" which were a "far cry from Zakora's specific, close-in-time failure" to investigate drug overdoses. *Id.* at 684-85.

Here, the Defendants' and the Plaintiff's briefing on the first part of the deliberate-indifference/failure-to-protect standard focuses extensively on *Zakora* and *Caraway*. Unsurprisingly, Plaintiff contends that the facts of this case hew closer to *Zakora* (where the Sixth Circuit found that there was an objectively serious risk to an inmate based on the presence of drugs) so that the Court should find that there existed an objectively serious risk to Moss based on the proliferation of drugs at HCCF. Defendants, on the other hand, contend that the facts of this case are more analogous to *Caraway* (where the Sixth Circuit found that there was not an objectively serious risk to an inmate) so that the Court should not find that there existed an objectively serious risk to Moss based on the proliferation of drugs at HCCF. Below, the Court will apply *Zakora* and *Caraway* to the instant case, beginning with an examination of whether the allegations in this action are analogous to the three key facts alleged in *Zakora* that supported finding an objectively serious risk of harm.

Turning to the first of those key alleged facts—the widespread presence of drugs, including how they arrived in the prison facility—Defendants argue that "in an effort to show a 'widespread presence of drugs' and 'temporally-proximate prior overdoses,' Plaintiffs cite to nine wholly discrete instances of inmate deaths that allegedly occurred at HCCF over a ten-month period." (Doc. No. 59 at 5-6). Defendants argue that such instances fail to allege "anything to do with [Moss]," fail to allege their "occur[ence] in the same area of HCCF as [Moss's] overdose," and, as such instances occurred over a "ten-month period," fail to allege facts "show[ing] the requisite temporally-proximate prior overdoses." (*Id.* at 6). Accordingly, Defendants argue Plaintiff fails to allege Moss's "unfettered access" to drugs at HCCF, thereby failing to allege the "objective prong of an Eighth Amendment claim." (*Id.* at 6-7). Plaintiff contends that the allegations in the Complaint, specifically the nine "[HCCF inmate] deaths from 2022 alone," show the "widespread illicit drug use occurring within HCCF." (Doc. No. 61 at 14).

With respect to this first key alleged fact, the Court finds that Plaintiff's allegations are analogous to *Caraway*. Plaintiff does allege with detail just how drugs were introduced into HCCF, specifically that "the predominantly females [guard staff] at HCCF and other CoreCivic facilities . . . have gang affiliations or romantic relationships with gang members . . . [permitting] illegal gangs [to] utilize the gang-affiliated guards and prison staff to smuggle drugs into CoreCivic facilities as what occurred at the HCCF [sic]." (Doc. No. 57 at ¶ 25). However, the Complaint fails to present sufficient allegations to establish that there was a widespread presence of drugs in HCCF in the leadup to Moss's overdose. Although Plaintiff purports to rely on the allegations of nine specific HCCF inmate deaths to establish this point, the Court reiterates its point in footnote 9 above that only the four Overdosing Inmates were in fact alleged by Plaintiff to have used drugs— meaning that, at most, Plaintiff has specifically alleged four discrete instances of drug use within

HCCF during 2022. But the first key alleged fact relied on in *Zakora* was the *widespread* presence of drugs, not the mere presence of drugs. Given the size of HCCF and its inmate population,[15] the Court does not find that four alleged instances of inmate drug use (i.e., drug use by the Overdosing Inmates) constitute *widespread* drug use at HCCF. So, the Court finds that with respect specifically to the first of the key alleged facts relied on in *Zakora* for finding an objectively serious risk of harm—the widespread presence of drugs—the allegations in this action are more analogous to *Caraway*.

Turning to the second of the key alleged facts relied on by the court in *Zakora* for finding an objectively serious risk of harm—previous overdoses—Defendants contend the previous overdoses alleged by Plaintiff fail to allege "anything to do with [Moss]," fail to allege "occur[ance] in the same area of HCCF as [Moss's] overdose," and, as such instances occurred over a "ten-month period," fail to allege facts "show[ing] the requisite temporally-proximate prior overdoses." (Doc. No. 59 at 6). Defendants emphasize that "[a]s noted in *Caraway*, '[the] mere allegation that inmates have overdosed—even at an increased rate—doesn't come close to showing the kind of excessive, one-for-every-eight risk *Zakora* faced.' *Caraway*, 98 F.4th at 684." (*Id.* at 6). In response, Plaintiff again refers to the nine specifically alleged "[HCCF inmate] deaths from 2022" and characterizes said deaths as all "drug related overdoses." (Doc. No. 61 at 14).

As far as this second key alleged fact, the Court finds that the allegations in this action are less analogous to *Zakora* (where, as a reminder, the Sixth Circuit found an objectively serious risk of harm based on the proliferation of drugs) and instead are much closer to the alleged facts in

---

[15] "Hardeman County Correctional Facility is owned by the Hardeman County Correctional Facilities Corporation, which contracts with CoreCivic for management of the prison. TDOC contracts for *1,976* medium security beds at this prison." *Hardeman County Correctional Facility*, https://www.tn.gov/correction/state-prisons/state-prison-list/hardeman-county-correctional-facility.html (last visited July 15, 2026) (emphasis added).

*Caraway* (where the Sixth Circuit found that there was no objectively serious risk of harm). Here, it is true that the Complaint includes allegations concerning nine HCCF inmates who died in the "ten (10) months before [Moss] died of an overdose . . . [and were] administered [varying] doses of Narcan for suspected overdose." (Doc. No. 61 at 14). But as the Sixth Circuit made clear in *Caraway*, "the mere allegation that inmates have overdosed—even at an increased rate—doesn't come close to showing the kind of excessive, one-for-every-eight risk Zakora faced." *Caraway*, 98 F.4th at 684. Moreover, although the complaint in *Zakora* had allegations concerning overdoses of two other inmates prior to Zakora's death, these were overdoses by two inmates in Zakora's 12-to-16-person cell block, which occurred just two days prior to Zakora's own overdose. *Zakora*, 44 F.4th at 461. By contrast, Plaintiff's allegations concern overdosing by inmates from HCCF *as a whole,* rather than overdosing by inmates in Moss's specific cell block.

As the Court noted in footnote 9 above, Plaintiff alleges (via reference to unspecified HCCF "reports" and documents, and not otherwise on independent grounds) that only four HCCF inmates—the Overdosing Inmates—*in fact* overdosed (on either methamphetamine or fentanyl) in the seven months prior to Moss's overdose. (Doc. No. 57 at ¶¶ 29-37). As to each of the Other Inmates, no specific cause of death is alleged—not even via incorporation of the HCCF "records" and documents. Instead, what Plaintiff alleges (via incorporation of the HCCF "records" and documents) is that the Other Inmates' deaths are "Under Investigation." (*Id.*). Reviewing carefully the paragraphs concerning the Other Inmates, the Court discerns that Plaintiff alleges at most that each such inmate *was believed at least initially*, by HCCF staff, *to have overdosed* and therefore was given varying doses of Narcan. (*Id.*).[16] So, Plaintiff's allegations concerning the specific

---

[16] Indeed, the only point at which the Court has found Plaintiff to assert the Other Inmates in fact overdosed is in Plaintiff's Response—"prior to [Moss's] untimely death, *nine (9) inmates* [i.e., the combined Overdosing Inmates and Other Inmates] *died of drug related overdoses.*" (Doc. No. 61 at 14, emphasis added).

overdoses of the Overdosing Inmates do not suffice to plausibly suggest the excessive risk of overdose seen in *Zakora* given that Plaintiff's allegations concern overdoses taking place in the seven months prior to Moss's overdose (rather than in the days prior to Moss's overdose). So, "[a]bsent more detailed allegations," the Court "cannot reasonably infer an overdose problem as acute as the one in *Zakora*." *Caraway*, 98 F.4th at 685.

That takes the Court to the last of the key alleged facts relied on by the court in *Zakora* for finding an objectively serious risk of harm, namely a failure of prison officials to investigate previous inmate overdoses. Defendants contend that "Plaintiffs fail to plead facts to show that HCCF failed to investigate prior overdoses" and that in fact Plaintiff "acknowledge[s] the exact opposite—that HCCF investigated these instances, as the [HCCF] incident reports note 'death under investigation.'" (Doc. No. 59 at 6-7). Plaintiff responds that "[Defendant] Warden Vantell did not request an investigation into the death of [Moss]" (Doc. No. 61 at ¶ 15), and "in 2022, prior to [Moss's] death . . . HCCF nevertheless continued to cover up the inmates' deaths that were due to reoccurring overdoses," (*id.* at ¶ 31).

With respect to this third key alleged fact, the Court finds that the allegations in this action are less analogous to *Zakora* and hew closer to *Caraway*. Here, Plaintiff has made only general allegations that Defendants failed to investigate prior overdoses—namely, the allegation that Defendants failed to investigate through "cover[ing] up the inmates' deaths that were due to reoccurring overdoses." (*Id.*). The only overdose death that, according to Plaintiff's allegations, went uninvestigated (in order to "cover up" allegedly unconstitutional conduct, Doc. No. 57 at ¶ 96) is Moss's overdose death. But of course Moss's own overdose, even if uninvestigated, cannot approximate the third key alleged fact relied on by the court in *Zakora:* a failure of prison officials to investigate overdoses that occurred *prior* to that of the decedent Zakora. And Plaintiff does not

allege that HCCF officials failed to investigate any *specific* inmate drug overdoses that preceded Moss's overdose.

So here, Plaintiff's allegations with respect to this fact are far from the "specific, close-in-time failure," *Caraway*, 98 F.4th at 685, of the prison officials in *Zakora* to investigate inmates' deaths (deaths, as a reminder, which occurred two days before *Zakora*'s own fatal overdose). *Zakora*, 44 F.4th at 461-62, 470, 472. Instead, just like in *Caraway*, Plaintiff here "alleged no immediately prior overdoses"[17] to Moss's own overdose, so "prison officials couldn't have failed to investigate them." *Caraway*, 98 F.4th at 685. And just like the court in *Caraway*, the Court concludes that Plaintiff's "generalized allegations about the defendants' failure to respond to the alleged drug problem" are insufficient for the Court to conclude that the problems in the instant action are similar to those in *Zakora*. *Id.*

In sum, of the three key alleged facts present in *Zakora* that allowed the court to conclude that there was an objectively serious risk of harm to the inmate in that action, none are present here. And thus, based on what *Caraway* said about *Zakora* at least, the Complaint fails to allege that Moss faced an excessive risk of harm from unfettered access to drugs.[18] *Cf. Caraway*, 98 F.4th at 685 ("Only one of the three key allegations in *Zakora* is arguably present here. Thus, the

---

[17] The most temporally proximate overdose, vis-a-vis Moss's overdose, by one of the Overdosing Inmates was over a month prior. (Doc. No. 57 at ¶¶ 29-37).

[18] Given this conclusion, the Court need not analyze Plaintiff's allegations regarding shortages of staff at HCCF and the alleged links between HCCF short-staffing and the widespread availability and/or proliferation of drugs at HCCF. (*See, e.g., id.* at ¶¶ 51-52, 61).

Regardless, Plaintiff's short-staffing allegations, at base, are no more than "broad allegations that CoreCivic prioritizes profit over safety and, as a result, deliberately operates with fewer officers than necessary." *Cook*, 2025 WL 967544, at *7. As this Court has previously noted in relying on *Caraway*, such general corporate-level allegations, which lack factual matter tying the understaffing to the alleged risk to the particular decedent at issue, fail to plausibly suggest entitlement to relief under Section 1983. *Id.* (citing *Caraway*, 98 F.4th at 686, wherein the *Caraway* court rejected the theory that understaffing caused rampant drug use where complaint contained "only generalized allegations" that prison understaffing caused drug use.).

complaint fails to allege that *Caraway* faced an excessive risk of harm from unfettered access to drugs.").

Accordingly, Plaintiff has failed to adequately plead an objectively serious risk of harm to Moss, and thus Plaintiff's Eighth Amendment claim(s) in Count I (alleging deliberate indifference, also known as failure to protect) fail(s) as to all Defendants. *See Caraway*, 98 F.4th at 686 (finding that because a "complaint fail[ed] to adequately plead an objectively serious risk of harm[,] [t]hat's enough to sink [an] Eighth Amendment [deliberate indifference] claim.").

### b. Count II: Monell Liability

As noted above, via Count II Plaintiff seeks to impose *Monell* liability on Defendant CoreCivic, Inc. (Doc. No. 57 at ¶¶ 87-96).  Like parts of Plaintiff's other federal count, Count II concerns alleged policies in place at HCCF. In particular, Count II is based on allegations that Defendant CoreCivic adopted a "policy and practice of severely understaffing its facilities and placing unqualified guards at posts in its facilities including HCCF, without regard to inmate safety because understaffing is more profitable." (*Id.* at ¶ 88).

However—and as noted at length above—given that Plaintiff has failed to allege an underlying constitutional violation—as shown by the failure of Plaintiff to state a claim as to the federal Section 1983 claim alleging violations of the Eighth Amendment in Count I—Plaintiff's attempt to impose *Monell* liability on Defendant CoreCivic also fails. *See Caraway*, 98 F.4th at 687 ("because the complaint doesn't allege an underlying constitutional violation, [the *Monell*] claims fail."); *Cook*, 2025 WL 967544, at *6 ("*Monell* liability is dependent on the existence of an underlying constitutional violation (by someone). If no such violation is plausibly alleged, the corresponding *Monell* claims necessarily fail"). *Cf. Williams v. CoreCivic of Tennessee*, LLC, No. 25-5377, 2026 WL 323971, at *4, *5 (6th Cir. Feb. 6, 2026) (declining to reach the question of

*Monell* liability where a plaintiff failed to sustain a plausible Section 1983 claim for Eighth Amendment violations). Accordingly, Count II will also be dismissed.

### c. Claims III, IV, V: State Law Claims

As noted above, Plaintiff also asserts several state law claims (Count III, Count IV, and Count V) against various combinations of the Defendants.

It is well-settled that a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see also Ford v. Frame*, 3 F. App'x 316, 318 (6th Cir. 2001) ("[D]istrict courts possess broad discretion in determining whether to retain supplemental jurisdiction over state claims once all federal claims are dismissed."). The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Having determined that Plaintiff's federal claims (over which the Court has original jurisdiction) should be dismissed, and because the Court finds that the aforementioned factors weigh in favor of declining jurisdiction over Plaintiff's state law claims—not least because Plaintiff does not otherwise argue that the Court should continue to exercise supplemental jurisdiction over her state law claims in the event the Court determines that her federal claims

should be dismissed—the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Instead, the Court will dismiss them without prejudice. Plaintiff may seek to refile them in a Tennessee state court, although the Court expresses no opinion about how those claims might fare in state court.

CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' Motion (Doc. No. 58) in its entirety. The Complaint (Doc. No. 57) will be **DISMISSED** as follows. Plaintiff's federal claims (Count I and Count II) will be dismissed in their entirety pursuant to Rule 12(b)(6). The Court, in its discretion, declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and these claims (Count III, Count IV, and Count V) will be dismissed in their entirety without prejudice.

An appropriate accompanying order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE